# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# CENTRAL DIVISION

| | |
|---|---|
| TONY D. DUDLEY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 09-4086-CV-C-NKL |
| | ) |
| LAKE OZARK FIRE PROTECTION | ) |
| DISTRICT, et al., | ) |
| | ) |
| Defendants. | ) |

## ORDER

Plaintiff Tony D. Dudley ("Dudley") alleges that Defendants Lake Ozark Fire Protection District, Everett Jarrett, Charlie Kempf, Ed Dobson, Matthew Birdsley, and Jim Elkin discriminated against Dudley because of his age. Dudley alleges violations of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq*., and the Missouri Human Rights Act ("MHRA"), Mo. Rev. Stat. §§ 213.010 *et seq*. He claims that he was demoted because of his age, subjected to retaliation, and subjected to a hostile work environment; he also alleges a conspiracy to violate civil rights under 42 U.S.C. § 1983. Before the Court is Defendants' Motion for Summary Judgment [Doc. # 39]. For the following reasons, the motion is granted.

## I. Factual Background[1]

Defendant Lake Ozark Fire Protection District ("District") operates an ambulance service. The service is licensed by the Missouri Department of Health and Senior Services, Bureau of Emergency Medical Services.

The District is governed by a three-member Board of Directors whose members are elected by the public. The Board can only conduct business by a quorum of at least two members. No employee can be employed or discharged by less than two Board members. Defendant Everett Jarrett ("Jarrett") is eighty-three years old and has served on the Board since January 2004. Defendant Charlie Kempf II ("Kempf") has served on the Board since April 2008. Defendant Ed Dobson ("Dobson") has served on the Board since approximately January 2009. Defendant Jim Elkin ("Elkin") served on the Board from 2001 until April 2008. Jacque Jeffords ("Jeffords"), 80 years old, served on the Board from 1990 until 2006.

Defendant Matthew Birdsley ("Birdsley") was employed by the District from 1998 to 2005. He was elected to the Board and served on it from April 2006 to September 2008, at which point he resigned. Birdsley was hired as the District's Assistant Fire Chief in October 2008.

---

[1] The following facts are drawn from the supported statements of undisputed facts set forth in the parties' briefs. All facts are considered in the light most favorable to Dudley, the nonmovant.

From approximately June 2003 to March 2008, Gary Woodson ("Woodson") was the Fire Chief for the District. After that, Mark Amsinger ("Amsinger") was promoted to Fire Chief.

The District hired Dudley in May 2001 to be its Emergency Medical Services ("EMS") Supervisor. Woodson was Dudley's supervisor. Though his job title changed at various times during his employment, his duties remained the same. He was responsible for establishing the District's ambulance service, and had complete oversight for anything relating to that service once it became operational. These duties included assisting in drafting the protocols, policies and procedures for the service.

Certain medications administered to patients of the District's ambulance service are deemed "controlled substances" under state and federal law. Missouri's controlled substance laws are administered by the Missouri Department of Health and Senior Services, Bureau of Narcotics and Dangerous Drugs ("BNDD"). In order to stock and administer controlled substances, the District was required to obtain a controlled substance registration with BNDD and the federal Drug Enforcement Agency. The District's registration became effective in July 2001. Without the registration, the ambulance service could not properly care for patients, as it would be unable to administer certain medications as necessary. The Board delegated to Dudley responsibility for ensuring compliance with controlled substance requirements, including inventory, records, and security requirements.

Entities which are registered to handle controlled substances are required to comply with certain laws, specifically Chapter 195 of the Missouri Revised Statutes and its accompanying regulations. One such requirement was to conduct both an initial inventory and annual inventories of controlled substances. Another is to keep a permanent written, typewritten, or printed copy of such inventories. A registrant's failure to comply with these requirements may result in warnings or censure in lieu of other disciplinary action.

BNDD may inspect the premises of a controlled substance registrant to determine compliance with controlled substance requirements. In April 2003, BNDD inspected the District and found violations. The violations included failure to conduct an initial inventory, which Dudley admits he did not perform as required. Other violations included failure to maintain the requisite annual inventories. Dudley testified that he had not performed the requisite annual inventories between 2001 and the 2003 inspection because he was not able to locate the appropriate forms.

Dudley also testified that he was and is not familiar with the BNDD regulations. He had not read them at the time of the 2003 inspection. He has never read BNDD regulations concerning annual inventory requirements. The BNDD inspector explained the requirements to Dudley during the 2003 inspection, providing forms for completing the inventory.

In a May 2003 letter in response to the BNDD inspection report, Dudley advised that "the violations . . . were . . . back in correct form." On August 7, 2003, BNDD issued a "Letter of Censure" to the District as a result of the inspection violations. The Letter of

Censure informed the District that future violations could result in further disciplinary action. The Letter of Censure required the District to respond within fifteen days of receipt of the Letter, including a "copy of the District's inventory of controlled substances on-hand." Dudley responded on August 23, 2003, stating that the District would "maintain quarterly and annual inventory report," attaching three pages purporting to be the District's inventory for May through July 2003. Dudley testified that he did not think the Letter of Censure was a "big deal;" he did not know what it meant to receive a Letter of Censure, and did not investigate any impact it could have on the District's registration.

Dudley informed Chief Woodson of the 2003 inspection and that he "had been cited" by the BNDD for records violations. Dudley told Chief Woodson that Dudley was going to follow the recommendations of the BNDD, and that he was going to keep all records on his computer. Dudley did not inform the Board of the 2003 inspection or Letter of Censure.

In September 2004, BNDD conducted a second inspection of the District's compliance with controlled substance requirements. That inspection found a failure to maintain the requisite annual inventory, though Dudley had been doing monthly inventories. He completed the annual inventory with the inspector, who explained the requirements to Dudley for a second time. BNDD issued a second Letter of Censure on January 18, 2005. Dudley did not think the second letter was a "big deal," and took no steps to determine what impact it might have on the District's registration. Dudley does not recall informing the Board about the 2004 inspection and violation or the 2005 Letter of Censure.

In 2008, BNDD again inspected the District, finding four violations, including the failure to maintain an annual inventory. Dudley testified that he maintained an annual inventory for 2005 through 2008 on his office computer, which had "crashed" in the summer of 2007, losing the inventory information. The District did not keep the hard drive from the computer and there is no evidence that Dudley had hard copies. Though Dudley later found a backup of inventory information that he maintained between 2003 and 2005, according to the BNDD inspection report, Dudley admitted to the BNDD inspector that he had never conducted an annual inventory, and Dudley could not produce annual inventories at the time of the inspection. Other violations included failure to maintain complete controlled substance records and inadequate security to detect and prevent drug diversion.

In a report, written on February 7, 2008, Dudley informed the Board that the District "passed" the BNDD inspection "with no problem." This statement was based on the inspector telling Dudley that the inspector did not believe the violations would be much of a problem, though Dudley had seen the violations listed on the report. On March 31, 2008, BNDD sent a letter to Dr. Richard Kimball, the medical director for the District's ambulance service, describing the history of the District's violations through the 2008 inspection. The letter requested an informal conference to discuss the findings and to give the District an opportunity to present information for consideration in the discipline process.

At an April 3, 2008, Board meeting, Dudley reported that the Department of Health and Senior Services had sent a letter regarding the 2008 inspection. At that meeting, Dudley

6

did not inform the Board that the District's controlled substance registration was at risk of discipline or share the contents of the March 31 letter. On April 16, 2008, Dudley informed the Board that BNDD had found a few violations. Dudley did not share the March 31 letter with the Board until Birdsley requested it.

Dudley first shared with the Board specific details regarding the District's noncompliance with controlled substance requirements at a May 7, 2008, meeting. Dudley did not tell the Board that the inspection findings were in error – for example, because he had done the inventories but they were lost on his computer.

On May 15, 2008, the Board voted unanimously to terminate Dudley from his position as EMS supervisor. At that time, Jarrett, Kempf and Birdsley were the Board members; they all believed the District's BNDD registration was in jeopardy. Kempf submitted an affidavit saying that he did not think of or consider Dudley's age, has never made comments regarding his age, and has never received a complaint from Dudley concerning discrimination. Birdsley says in an affidavit that he never heard of Dudley complaining about discrimination. The minutes of the Board meeting state that Dudley was terminated for failing to notify the Board of the series of BNDD violations and the resulting risk to the District's controlled substance registration.

At the same meeting, the Board offered Dudley a position as a firefighter/paramedic, which he accepted. Vince Loyd was named interim EMS supervisor after Dudley's termination from the position; while Loyd is younger than Dudley, the evidence submitted

does not indicate how much younger. After Dudley's demotion, additional BNDD violations by Dudley – including leaving controlled substances in his unlocked, unsecured office – were discovered by Loyd; Dudley does not contest Defendant's supported assertion that the Board would have demoted Dudley as EMS supervisor if they had known of such violations.

Chief Woodson was aware that Dudley was maintaining an annual inventory "on the department computer from 2003, 2005-2008." Chief Woodson was aware of the "basic adequacy" of the inventory Dudley kept on his computer. During the 2008 inspection, Chief Woodson was aware that Dudley's computer had lost all of his annual inventory reports. The Board never asked Chief Woodson about whether Dudley had been keeping an annual inventory on his computer. Chief Woodson was not the fire chief at the time of Dudley's demotion.

In June 2008, Dr. Kimball, Chief Amsinger, and Birdsley met with BNDD representatives to discuss the violations. In October 2008, the District entered into a Settlement Agreement with BNDD, under which the District's controlled substance registration was placed on probation for three years.

There is evidence that Birdsley made comments during Dudley's employment concerning replacing "old" employees. Chief Woodson states that Birdsley had stated "numerous times" – before and after being elected to the Board by the public in 2006 – that Birdsley intended to replace all "old farts." Dudley testified that Birdsley stated, in Dudley's presence, that Birdsley was "going to go get rid of all of [the] old people, old farts, and ...

8

replace them with his cronies." Dudley testified that he was told by Birdsley that he intended to get rid of the "old chiefs" so that the District's pension fund could grow more quickly. Jeffords submitted an affidavit stating that Birdsley "worked with younger members of the Union to replace older Board Members and subsequently Chief Woodson and ... Dudley solely because of age;" Jeffords comments that "this effort resulted in my replacement and that of Jim Elkin to control the Board of Directors." Jeffords heard Birdsley comment on replacing older people in the District with younger members of the Union.

Chief Woodson states that, in January and February 2008, he experienced a hostile work environment at the hands of Birdsley. Chief Woodson says that he was "terminated defacto" by the Board and replaced with Chief Amsinger, who is much younger than Chief Woodson. Chief Woodson states that he complained "many times of the age discrimination treatment of ... Birdsley to ... Jeffords ... and ... Elkin," telling them "that the Union was going to replace older members of the Fire Department." The Board that replaced Chief Woodson was different – with the exception of Birdsley – from the Board that demoted Dudley.

There is evidence that union issues played a role in Board decisions. In addition to the union comments stated above, Chief Woodson opines that, after Kempf was elected by the public to the Board in April 2008, "the Board was controlled by the majority of younger union members." After Kempf joined the Board, eighty-year-old Jarrett was also on the three-member elected Board. Though Dudley states that he reported discrimination to Chief

9

Woodson when he was the chief, Dudley did not report any alleged discrimination or age-related comments to the Board, because he thought "they were all union people" and would not have paid attention to it. Though Jeffords stated that Birdsley wanted younger union members to be in charge, he explained, "the primary cause was to increase wages of the firemen of ... the District and less emphasis on equipment purchase." Dudley testified that Birdsley told Dudley that, because he was one of the "longest employees" with the District, his retirement benefits would cost the District more money than "new" employees.

Dudley states several claims for relief in his Complaint. Count I alleges age discrimination under the ADEA and the MHRA. Count II alleges conspiracy to violate civil rights of older employees under 42 U.S.C. § 1983. Count III alleges hostile work environment relating to age under the ADEA and MHRA. Count IV alleges retaliatory discharge under the ADEA and MHRA.

**II.     Discussion**

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of demonstrating there is no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). If the moving party satisfies its burden, Rule 56(e) requires the nonmoving party to respond by submitting evidentiary materials that designate "specific facts showing that there

is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). When considering a motion for summary judgment, the Court must scrutinize the evidence in the light most favorable to the nonmoving party and the nonmoving party "must be given the benefit of all reasonable inferences." *Mirax Chem. Prods. Corp. v. First Interstate Commercial Corp.*, 950 F.2d 566, 569 (8th Cir. 1991). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Liberty Lobby, Inc.*, 477 U.S. at 248.

### A. Age Discrimination

Both the ADEA and MHRA prohibit age discrimination. To prevail on his age discrimination claim under the ADEA, Dudley must show by a preponderance of the evidence that he would not have been demoted "but-for" Defendants' discriminatory motive. *Gross v. FBL Fin. Servs.*, 129 S. Ct. 2343, 2351 (2009) (addressing ADEA claim). The MHRA is "less demanding," requiring plaintiffs to show that age was a "contributing factor" in an employer's adverse employment action. *See Daugherty v. City of Maryland Heights*, 231 S.W.3d 814, 820 (Mo. 2007); *Hill v. Ford Motor Co.*, 277 S.W.3d 659 (Mo. 2009). Courts considering summary judgment on MHRA claims "must determine whether the record shows two plausible, but contradictory, accounts of the essential facts and the 'genuine issue' in the case is real, not merely argumentative, imaginary, or frivolous." *Daugherty v. City of Maryland Heights*, 231 S.W.3d 814, 820 (Mo. 2007) (citation omitted). Under both the ADEA and MHRA, plaintiffs must establish their claims by a preponderance of the evidence.

*Riley v. Lance, Inc.*, 518 F.3d 996, 1000 (8th Cir. 2008). Dudley cannot meet his burden under either statute.

Dudley has presented evidence that he and Woodson were terminated or demoted, and replaced with "younger" employees. He has also shown that Birdsley expressed a strong desire and intent to remove older workers from the District. This, however, is insufficient under the ADEA to show that he would not have been terminated but for discrimination. Without evidence that the employee who replaced Dudley was significantly younger, or that the employee was less qualified than Dudley, the fact that he was replaced with a younger worker gives rise to only a limited inference of discrimination. *See Ramlet v. E.F. Johnson Co.*, 507 F.3d 1149, 1153-54 (8th Cir. 2007) (finding that a one- and five- year age difference between the plaintiff and his replacements were insufficient to establish a prima facie ADEA case). Further, there is no evidence that Birdsley's comments influenced the decisions of the other two Board members who voted to demote Dudley.

The Board that voted unanimously to demote Dudley included not just Birdsley, but also Jarrett and Kempf. Dudley has not submitted evidence that Jarrett or Kempf acted in a discriminatory manner or were nothing more than Birdsley's puppets. There is no evidence that either of them expressed any age related comments or took any age related actions. While Dudley, Woodson and Jeffords claim Birdsley controlled the Board, they point to no facts supporting this conclusion. The Board was elected by the public and there is no evidence that Birdsley controlled that process. On this record, it would be speculative to find

that either Jarrett or Kempf were not independent decisionmakers. *See Elnashar v. Speedway SuperAmerica, LLC*, 484 F.3d 1046, 1057 (8th Cir. 2007) (finding that discriminatory statements by one of multiple decisionmakers did not show that a proffered reason for an adverse employment decision was pretext for discrimination where the comments were not connected to decision-making process). Thus, even without Birdsley's vote, Dudley would still have been terminated.

In addition, there is substantial evidence that Dudley, over the course of several years and with repeated warnings and guidance from BNDD, failed to meet his responsibilities with regard to controlled substance regulations.[2] Dudley was the EMS supervisor who was completely responsible for all aspects of ambulance service and BNDD compliance. He did not read BNDD regulations or call the Letters of Censure to the Board's attention; he did not take steps to assure that appropriate forms were completed prior to the April 2003 inspection – which occurred approximately twenty months after ambulance service commenced. Dudley does not dispute that he did not prepare a 2004 annual inventory as required. Even if the computer lost copies of other inventories, he failed to keep printed copies as required. Dudley did not take steps to determine the impact of the first two Letters of Censure, thinking they were not a big deal. After the third inspection, despite having been informed of four violations, he told the Board that the District had passed the inspection with no problem. He

---

[2] It is not clear whether the burden shifting analysis of *McDonnell Douglas* is applicable to ADEA cases. *See, Baker v. Silver Oak Senior Living Management Co.,* 581 F.3d 684, 688 (8th Cir. 2009). Nonetheless, the Court has addressed the District's stated reason for the termination because it is relevant under both analytical frameworks.

did not inform the Board immediately that the BNDD was considering discipline in April 2008. He did not inform the Board that the inspection findings were in error – for example, because he had done inventories but they were lost on his computer. Because of certain violations of BNDD requirements, BNDD censured and disciplined the District – its controlled substance registration was placed on probation for three years. Even if Dudley believed that BNDD was wrong, the Board members – the decisionmakers – believed that the District's controlled substance regulation could be disciplined or possibly revoked. *See Bettner v. Administrative Review Board*, 539 F.3d 613, 622 (7th Cir. 2008) ("Our inquiry . . . is limited to the belief of the decisionmakers, whether or not that belief is reasonable."). The ample evidence that Dudley was not adequately performing his job substantially undermines any inference that he was terminated because of his age. *See, e.g., Erenberg v. Methodist Hosp.*, 357 F.3d 787, 793 (8th Cir. 2004) (affirming summary judgment where an employee failed to prove a prima facie case of age discrimination in that she failed to show that she was qualified for a position where deficiencies in her work had been identified on a regular basis). Thus, Dudley cannot demonstrate that Defendants' stated reason for demoting him was pretext for discrimination, such that a trier of fact could infer from the falsity of the explanation that Defendants are trying to hide discrimination. *See Reeves v. Sanderson Plumbing Products Inc.*, 120 S. Ct. 2097, 2108 (2000); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993) ("rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination").

It is true that the MHRA has a lower evidentiary burden than the ADEA. To succeed on an MHRA claim, Dudley need only show that age was a contributing factor in the Board's decision to terminate him. However, even that standard requires a causal link between an adverse action and discrimination. Given the fact that two members of a three person board voted to terminate Dudley and there is no evidence that they were influenced in any way by Dudley's age, he cannot avoid summary judgment even on the more generous evidentiary standard of the MHRA.

**B.     Retaliation**

Nor can Dudley establish a case of retaliation under the ADEA or MHRA. Plaintiffs alleging retaliation under the ADEA must show that they engaged in protected activity (such as complaining of discrimination), that their employers took adverse employment action, and that there was a causal connection between the activity and the adverse action. *Betz v. Chertoff*, 578 F.3d 929, 937 (8th Cir. 2009). Similarly, retaliation claims under the MHRA require a showing that plaintiffs complained of discrimination, that their employers took adverse action, and there was a causal relationship between the complaint and action. *Cooper v. Albacore Holdings, Inc.*, 204 S.W.3d 238, 245 (Mo. App. Ct. 2006).

Dudley points to no evidence linking protected conduct by him with the Board's decision. Chief Woodson did say that Chief Woodson complained to Birdsley, Jeffords, and Elkin of age discrimination and that Chief Woodson was later terminated. But that does not amount to Dudley's engaging in protected activity. There is no evidence that Dudley

15

complained to Birdsley, or that Birdsley knew of any complaints. Moreover, there is no evidence that other Board members – Board members who were not on the Board when Chief Woodson was terminated – knew of any protected activity by Dudley. *See Chukwurah v. Stop & Shop Supermarket Co. LLC*, 354 Fed. Appx. 492, 495-96 (2d Cir. 2009) (finding that an employee failed to make out a prima facie case of retaliation where he did not show that the decisionmaker was aware of the protected activity); *Dickerson v. Walgreen Co.*, 345 Fed. Appx. 178, 180 (7th Cir. 2009) (indicating that employees cannot make out cases of retaliation by referring to the treatment of other employees who were not subject to decisions by the same decisionmakers). Dudley cannot show that he engaged in protected activity, much less a link between such activity and adverse employment action. Even if he could show such a link, as with his discrimination claim, he has not presented evidence indicating that the legitimate non-discriminatory reason cited by the Board for his demotion was pretextual. As such, Dudley cannot establish a retaliation claim.

**C. Hostile Work Environment**

Dudley also cannot show that he was subject to an actionable hostile work environment. To establish hostile work environment ADEA claims, plaintiffs must show that they were subjected to unwelcome harassment based on their ages which affected a term or condition of employment, and that their employers should have known of the harassment and failed to take proper action. *Peterson v. Scott County*, 406 F.3d 515, 523-24 (8th Cir. 2005). Like the ADEA, hostile work environment claims under the MHRA require a

showing that a protected employee was subject to unwelcome harassment in which protected status was a contributing factor and which affected a term or condition of employment. *Hill v. Ford Motor Co.*, 277 S.W.3d 659, 666 (Mo. 2009) (discussing sexual harassment).

In considering hostile work environment claims, courts look to whether a reasonable person would find the environment hostile and abusive, including whether conduct "is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. *Peterson v. Scott County*, 406 F.3d 515, 524 (8th Cir. 2005) (citation omitted); *see also Hill*, 277 S.W.3d at 666 (discussing sexual harassment). Simple teasing, offhand comments, and sporadic use of abusive language do not amount to discriminatory changes in employment terms and conditions amounting to actionable harassment. *Peterson*, 406 F.3d at 524. The harassment must have caused (ADEA) or contributed to (MHRA) the change in terms and conditions of employment. *See Peterson*, 406 F.3d at 524*; Gilliland v. Missouri Athletic Club*, 273 S.W.3d 516, 521 (Mo. 2009) (en banc).

Dudley does not present evidence of severe or pervasive harassment which had an impact on a term or condition of his employment. There is evidence that Birdsley made comments relating to age. There is evidence that Woodson believes he was discriminated against. Dudley does not offer evidence showing that the environment was physically threatening or humiliating, or unreasonably interfered with his work performance. *See Peterson*, 406 F.3d at 524 (finding that repeated references to "old ladies," a comment that

17

it was hard to train old ladies, and comments that women were incapable of performing job duties, while offensive, did not reach the level of harassment); *Elnashar*, 484 F.3d at 1057 (finding that stray comments and an incident of unwanted touching did not amount to a sufficiently severe or pervasive condition which would support a hostile work environment claim). His hostile work environment claims must be denied.

D. **Section 1983**

Dudley alleges that Defendants' conduct violated § 1983 in that they conspired to violate his civil rights by discriminating against him on the basis of his age. Courts considering § 1983 claims based on conduct constituting an alleged ADEA violation have found the claims preempted by the comprehensive statutory scheme for addressing alleged age discrimination provided by the ADEA. *Ahlmeyer v. Nevada Sys. of Higher Ed.*, 555 F.3d 1051, 1056 (9th Cir. 2009) ("No circuit to consider the issue of whether the ADEA precludes § 1983 claims has . . . allowed a § 1983 claim based on the same conduct to go forward." (discussing cases)).

While the Eighth Circuit has not yet addressed the issue, even if Dudley's § 1983 claim is not preempted, it does not survive summary judgment. To prevail under § 1983 based on discriminatory conduct, Dudley must show intentional discrimination. *King v. Hardesty*, 517 F.3d 1049, 1057 (8th Cir. 2008). As discussed above, Dudley has not presented evidence from which a reasonable juror could conclude that Defendants intentionally discriminated against him.

## III.    Conclusion

Accordingly, it is hereby ORDERED that Defendants' Motion for Summary Judgment [Doc. # 39] is GRANTED.

s/ Nanette K. Laughrey<br>
NANETTE K. LAUGHREY<br>
United States District Judge

Dated: May 17, 2010
Jefferson City, Missouri